UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VICTORIA NEZAJ,

                                        Plaintiff,

                    -v-

PS450 BAR AND RESTAURANT, ET AL.,

                                        Defendants.

---

22 Civ. 8494 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

Plaintiff Victoria Nezaj brings this action against her former employer PS450 Bar and

Restaurant ("PS450"); its alleged corporate alter egos Park South Hospitality, Cerus Hospitality

Consulting, LLC, and Vig Park, Inc.; and former supervisors Terry Brooks, Matt Wagman, and

David Miller. Nezaj worked for PS450 as an events manager and floor manager for about six

months until she was terminated. She alleges that PS450 and the other corporate defendants, by

and through the individual defendants, discriminated against her and ultimately fired her based

on her gender and sexual orientation.

Pending now is a motion from defendant Miller to dismiss the claims against him for

failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). These claims are of

discrimination, aiding and abetting discrimination, and retaliation, in violation of the New York

State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq*, and the New York City

Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-502(a) *et seq*. For the reasons that

follow, the Court dismisses the claims against Miller that allege discrimination based on sexual

orientation, but otherwise denies the motion to dismiss.

## I.    Background[1]

### A.    Factual Background

Nezaj is a gay woman currently residing in New Orleans, Louisiana.  Dkt. 49 ("FAC") ¶¶
8, 83.  As of 2019, she had more than 14 years' experience working in the hospitality industry;
she has a bachelor's degree in business and marketing.  *Id.* ¶¶ 20–21.  In August 2019, Nezaj met
with Brooks, the director of hospitality at PS450, to interview for an "events manager" position
at PS450, a bar and restaurant in midtown Manhattan.  *Id.* ¶ 20.  In September 2019, Wagman,
PS450's chief executive officer, called to offer Nezaj a job, under which Nezaj would work a
"hybrid" position, serving as events manager during the day on Tuesdays, Wednesdays, and
Thursdays, and as a "floor manager" on Friday and Saturday nights.  *Id.* ¶ 22.

Nezaj maintains that from the start of her employment at PS450, she experienced a
workplace culture "openly hostile towards women and LGBTQIA+ employees," and dominated
by male managers like Brooks and Miller, the director of operations, who created a "fraternity-
like 'Boy's Club' and consistently treat[ed] female and LGBTQIA+ employees less well than
they treated straight male employees."  *Id.* ¶ 24; *see also id.* ¶¶ 18, 23.  During Nezaj's time as an
employee with PS450, the majority of servers and bartenders were young women expected to
flirt with male patrons, while all the managers save Nezaj were men.  *Id.* ¶ 25.

Generally, Nezaj alleges that Brooks in particular "frequently made misogynistic and
homophobic comments" in front of female staff, Miller, and Wagman, as well as engaging in

---

[1] The Court draws the facts in this decision principally from the First Amended Complaint, Dkt.
49 ("FAC").  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In
considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district
court may consider the facts alleged in the complaint, documents attached to the complaint as
exhibits, and documents incorporated by reference in the complaint.").  For purposes of the
motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the FAC as
true, drawing all reasonable inferences in Nezaj's favor.

inappropriate, "as well as disrespectful and condescending treatment[]" of female and gay staff. *Id.* ¶ 26.  Miller, meanwhile, failed to stop this behavior and "regularly encouraged and ok'd the behavior by openly laughing in direct response to Defendant Brooks' discriminatory conduct." *Id.*  Nezaj alleges that this behavior bothered many employees at PS450, and that several female employees had quit because of it and several more told Nezaj during her tenure that they wanted to quit because of it.  *Id.* ¶ 27.  Nezaj alleges, on information and belief, that she was hired to replace "a gay, Hispanic male employee . . . who quit his position . . . because of the discriminatory and abusive work environment at [] PS450." *Id.* ¶ 31.  Miller's acquiescence in and support of this behavior was allegedly well-known among staff.  *Id.* ¶ 27.

The FAC pleads several instances or patterns of behavior that it claims evince disparate treatment, discrimination, and/or retaliation.

### 1.    Verbal and Other Harassment by Brooks

The FAC alleges that Brooks "repeatedly and consistently engaged in inappropriate and discriminatory behavior towards [Nezaj] because of her gender," acting "especially hostile" because she was the only female manager and trying to intimidate and "exert dominance" over her.  *Id.* ¶¶ 36, 37.  His actions included, "on multiple occasions, starting around October of 2019," touching Nezaj on her back, shoulders, and knees, laughing when Nezaj explained she did not like to be touched, and touching her more after her protests.  *Id.* ¶ 38.  Brooks also mocked, condescended to, interrupted, and otherwise disrespected Nezaj in front of the employees she managed.  *Id.* ¶¶ 39–42.  Brooks also forced Nezaj to do "menial office tasks" outside the normal scope of her job duties; he did not ask male manages to perform these same tasks.  *Id.* ¶ 50.  In one such incident, Brooks did not respond to a question Nezaj had asked him, instead pointing at a ringing telephone and repeating the word "phone" until Nezaj answered it.  *Id.* ¶ 51.

Nezaj also alleges harassing comments by Brooks. In November 2019, after she mentioned to Brooks that she was feeling nauseous, he replied: "Maybe you should pee on a stick." *Id.* ¶ 62. The next morning, Brooks asked Nezaj if she had "peed on a stick," which "shocked and humiliated" Nezaj, who told Brooks that her pregnancy status was not his concern. *Id.* ¶¶ 63–64.

In December 2019, Brooks told a story in front of Nezaj and a few other female employees about a woman at his last job who "he claimed could not do simple math." *Id.* ¶¶ 84–85. "Brooks said that he had to 'put it into terms that she could understand' by asking, 'if you sleep with three guys a week for four weeks, how many guys have you slept with by the end of the month?'" *Id.* ¶ 84. The same month, after Nezaj mentioned St. Patrick's Day, "Brooks gleefully said that all he knew was that March 14th was 'National Blow Job and a Steak Day,' and that he 'make[s] sure [his] wife knows what day that is.'" *Id.* ¶ 86. Brooks then leaned over Nezaj's shoulder to search "Blow Job and a Steak Day" on her laptop, invading her personal space to do so. *Id.*

In January 2020, Brooks told a story in front of Nezaj about a time where he had been playing cards with a woman in Las Vegas. *Id.* ¶ 87. Per Brooks, the woman he was playing with had said: "If you had a 12-inch dick, would you split that?" *Id.*

The FAC also states that Brooks "treated Plaintiff differently because of her sexual orientation." *Id.* ¶ 47. For example, after Brooks deduced that Nezaj had dated a woman, he "routinely insisted that [Nezaj] work with [PS450's] only openly gay client because 'he likes you people better.'" *Id.* ¶ 48. Brooks also expressed discomfort with an event at the bar that involved a performance by a drag queen, rolled his eyes at mention of the event, and ultimately "distanced himself" from the event altogether. *Id.* ¶ 49.

4

Brooks likewise made offensive comments about LGBTQIA+ individuals, saying about one client: "Why is [this client] calling me so early? Shouldn't he be biting a pillow right now?" *Id.* ¶ 89.

Although the FAC does not specifically allege that Miller was present for any of these incidents, it states generally that Miller was often present when Brooks made harassing remarks or otherwise engaged in such behavior. *See id.* ¶¶ 26–27, 58, 83. It adds: "Upon information and belief, Defendant Miller never reprimanded Defendant Brooks or asked him to stop treating female and gay employees, or reported him to CEO W[a]gman, as he should have." *Id.* ¶ 83.

### 2. Objections to Dress Code

Nezaj dresses in a "more androgynous style." *Id.* ¶ 32. She states that it was "obvious" that this bothered PS450's male management; Brooks warned her that "the last girl that had [her] job wore heels." *Id.* Female bartenders and servers were officially required to dress in a "sexualized" way, with boots at a certain length, shirts cut a certain way on the chest, and tight leggings or short shorts and skirts. *Id.* ¶ 33. Male employees were allowed to wear "regular clothing like jeans and sneakers." *Id.* ¶ 34.

Nezaj asked if she could wear sneakers while managing the floor on Friday and Saturday nights, but was told no and that she had to "'set an example' for 'the girls.'" *Id.* ¶ 35. Nezaj pointed out that male employees, including managers, were allowed to wear sneakers, but the defendants continued to push her to dress like the other female staff members. *Id.* Nezaj was finally allowed to wear sneakers after she told the defendants she needed them for her back problems, but she was not permitted to wear them when meeting with clients and "it was clear that Defendant Brooks was unhappy about it." *Id.*

### 3.    Rebuffed Report of Misogynistic Client

During Nezaj's first month on the job, Miller told her she should introduce herself as events manager to a client who frequently hosted events at PS450. *Id.* ¶ 43. When Nezaj did so, the client's behavior was "incredibly rude and misogynistic." *Id.* ¶ 44. The client asked Nezaj "what she wanted to do for her career and if she was 'also in school.'" *Id.* ¶ 44. Nezaj responded that she already had a bachelor's degree and that event planning was her career. *Id.* The client acted surprised and "sarcastically clapped," commenting, "Wow, good for you." *Id.* ¶ 45.

Nezaj knew that PS450 management had interceded when a male employee had complained about a rude client, and so reported this incident to Brooks and Miller, telling them the client was "an Olympic Level Misogynist." *Id.* Miller laughed and asked what had happened; after Nezaj explained, Miller laughed again while Brooks remarked "[t]hat sounds like him." *Id.* Brooks continued: "I wonder if there's anything misogynistic I could have you do before you leave [work] today." *Id.* Miller laughed in response to this comment and did not admonish or reprimand Brooks for making it. *Id.*

### 4.    Disparate Treatment in Scheduling

Male managers were given more time flexibility with their work schedules, whereas Nezaj was often required to fill in for them when they wanted time off. *Id.* ¶ 52. Generally, PS450 often changed Nezaj's schedule to accommodate male managers. *Id.*

In November 2019, PS450 announced that employees would receive the December schedule in advance, because all employees would be working extra hours during the holiday season. *Id.* ¶ 53. Nezaj asked Brooks and Miller for her December schedule in advance so that she could plan her personal schedule. *Id.* ¶ 54. When she asked, Brooks responded asking, "condescendingly," "What exactly are you looking for?" *Id.* ¶ 55. When Nezaj clarified that,

like the other managers, she wanted her December work schedule in advance, neither Brooks nor Miller provided it to her.  *Id.* ¶¶ 55–56.  Nezaj's December schedule was then repeatedly changed at the last minute; she does not know of any male managers made to work last minute that December.  *Id.* ¶ 57.

### 5.     Request for Feminine Hygiene Products

In November 2019, Nezaj asked Brooks if PS450 could provide employees with feminine hygiene products and pain relievers, because female servers regularly needed these products during work hours and so left work to go purchase them.  *Id.* ¶ 59.  In response, Brooks said to Miller: "Hey Miller, Victoria wants to know if you want to buy tampons."  *Id.* ¶ 60.  Miller replied: "What?"  *Id.*  Nezaj again explained her reason for asking, to which Miller responded, "in an extremely annoyed manner": "No."  *Id.*  Brooks then laughed at Nezaj.

### 6.     Complaint About Discrimination and Retaliation

In December 2019, after Brooks' "pee on a stick comment," Nezaj decided to report "the discrimination in the hopes that it would end."  *Id.* ¶ 65.  On or around December 1, 2019, Nezaj spoke with Wagman about Brooks, telling him that Brooks made her feel "uncomfortable and humiliated with his inappropriate behavior and condescending comments."  *Id.* ¶ 66.  She specifically referenced the "pee on a stick" comment as well as Brooks yelling "phone" at her while pointing to the ringing telephone.  *Id.*  Wagman responded by saying that Brooks could be "crass" and that he "wears his heart on his sleeve."  *Id.* ¶ 67.  Nezaj then asked Wagman how he would feel if his wife's boss treated her in this way.  Wagman replied by repeating that the conduct was crass but that Brooks wore "his heart on his sleeve."  *Id.* ¶ 68.  Nezaj countered, "I must not be the first girl who has reported this to you," to which Wagman responded, "Actually you are."  *Id.* ¶ 69.

Wagman then began criticizing Nezaj's performance, including that she always wanted to leave her shift at the scheduled time. *Id.* This was the first Nezaj had heard of dissatisfaction with her job performance; she asked for directions on how to improve. *Id.* ¶ 70. Nezaj asked Wagman not to tell Brooks about her having report him, but Wagman ignored this and told Brooks and Miller. *Id.* ¶ 71. Brooks' behavior worsened after this report. He became cold and distant, and was clearly enraged at Nezaj, while Miller all but ignored her. *Id.* ¶¶ 72–73.

Miller and Brooks proceeded to shut Nezaj out of certain responsibilities within her job description. For example, Nezaj was not included in hiring interviews, including for a position meant to assist her. *Id.* ¶ 74. Brooks also told Nezaj she was no longer allowed to answer event inquiries on her own, and had to forward all inquiries to him. *Id.* ¶ 75. Nezaj was also cut off from nearly all event planning save for managing the actual events. *Id.* Nezaj asked why she was being prevented from performing these job duties. It is not clear whether she ever received a response. *Id.* ¶ 76.

On or around December 11, 2019, soon after Nezaj had complained to Wagman, Brooks reprimanded Nezaj for leaving at the time scheduled instead of working extra hours. *Id.* ¶ 77. Miller was usually the manager on duty when Nezaj's shifts ended. *Id.* Miller repeatedly told Nezaj to stay after her shift to answer phones. *Id.* ¶ 79. Brooks also began blaming Nezaj for others' mistakes, including an instance where Brooks forgot to make food platter selections for an event and blamed it on Nezaj. *Id.* ¶ 82.

In early 2020, Nezaj continued to be shut out of event planning and grew increasingly worried she would be fired for not planning events. *Id.* ¶ 91. In or around January 2020, she reported to Miller that she was not being allowed to do her job and reminded him she was the

event manager. *Id.* Miller shrugged and walked away. *Id.* In February 2020, Nezaj learned that she had been the only employee not invited to the PS450 staff holiday party. *Id.* ¶¶ 96–97.

Throughout January and February 2020, Brooks continued to exhibit similar behavior patterns toward Nezaj—making "condescending remarks," refusing to engage with her about issues at work, and generally treating her "like his personal assistant and receptionist." *Id.* ¶ 92. During a meeting in January 2020, Brooks continually cut Nezaj off while she was speaking and insulted her ideas, such that after Brooks left the room, an event assistant present asked Nezaj why Brooks treated her in that manner. *Id.* ¶ 93. In January or February 2020, Brooks also tried to force Nezaj to move a party even after she voiced a contrary opinion; after Brooks left, a male manager present named Ryan agreed with Nezaj and told her not to move the guests. *Id.* ¶ 94. During this period, multiple coworkers asked Nezaj why Brooks was so hostile towards her. *Id.* ¶ 95.

On or around February 14, 2020, after Nezaj reported for work, Wagman asked Nezaj to speak with him and Miller. Wagman told Nezaaj she was being terminated because she did not book enough holiday events, causing PS450 to lose money such that it could not afford to keep paying Nezaj's salary. *Id.* ¶¶ 100–01. Miller told Nezaj he was sorry to let her go and thanked her for her service. *Id.* ¶ 101. Nezaj is unaware of anyone else, or any male manager, who was similarly terminated. *Id.* ¶ 102.

### 7. Comparators

The FAC identifies two persons as comparators to Nezaj. Their treatment, it contends, shows that straight men were treated better at PS450 than gay and/or female employees.

First, Brooks was "extremely friendly with most of the male employees and managers, including a male bartender and manager named Bill Brooks." *Id.* ¶ 29. Although Bill Brooks "frequently engaged in irresponsible workplace behavior such as being intoxicated at work and

failing to complete his shift duties," he was not reprimanded. *Id.* In contrast, female and gay employees who engaged in similar behavior were reprimanded. *Id.*

Second, Brooks treated male manager Luiggy Reyes "differently than he treated female and gay employees." *Id.* ¶ 30. Reyes "often failed to complete his shift duties, and, in fact, was often 'missing' when he was supposed to be managing[,]" but he was never disciplined. *Id.*

### B.    Procedural History

On October 5, 2022, Nezaj filed the initial Complaint. Dkt. 1. On February 10, 2022, Miller filed a motion to dismiss the claims against him. Dkt. 35. The Court then issued an order directing Nezaj to respond to the motion or amend her complaint. Dkt. 38. On April 7, 2023, Nezaj filed the FAC, the operative complaint today. Dkt. 49. On April 27, 2023, Miller filed the motion, resolved here, to dismiss the FAC. Dkts. 53, 54 ("Miller Br."). On May 25, 2023, Nezaj filed a response. Dkt. 60 ("Nezaj Br."). On June 12, 2023, Miller filed his reply. Dkt. 62 ("Miller Reply").

## II.    Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief. *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor fo the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels

and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."
*Twombly*, 550 U.S. at 555.

### III.    Discussion

Miller moves to dismiss all claims against him for failure to state a claim. No other
defendant, corporate or individual, has so moved. The Court's focus thus is solely on whether
the FAC plausibly states claims against Miller. Three sets of claims name Miller: (1) for gender
and sexual orientation discrimination, in violation of the NYSHRL and NYCHRL, *see* FAC
¶¶ 105–13; (2) for retaliation, in violation of the NYSHRL and NYCHRL, *see* FAC ¶¶ 114–28;
and (3) for aiding and abetting discrimination and retaliation, in violation of the NYSHRL and
NYCHRL, *see* FAC ¶¶ 135–40.

### A.    Available Theories of Liability

At the threshold, Miller seeks to clarify the theories of liability for discrimination from
the FAC that Nezaj may pursue against him under the NYSHRL and NYCHRL. The FAC
alleges that Miller served as PS450's director of operations and that he co-owned PS450. *See*
FAC ¶ 18. Miller argues that he may not be held vicariously liable based on his ownership of
PS450. *See* Miller Br. at 9. He is correct on that point. However, there are other avenues for
Nezaj to pursue discrimination liability against him under the two statutes.

Under both the NYCHRL and the NYSHRL, a person qualifying as an "employer" may
be held liable for the discriminatory actions of others. *See Doe v. Bloomberg L.P.*, 143 N.Y.S.3d
286, 292 (2021). However, as the divided New York Court of Appeals clarified in *Doe* in 2021,
where a corporate entity is the plaintiff's employer, an individual affiliated with the entity cannot
himself qualify as the employer. That is so even if the individual holds a high post at the

employer or owns the entity.[2] *Id.* at 291–92; *see, e.g., Belyea v. City of Glen Cove*, No. 20 Civ. 5675 (MKB), 2023 WL 1929787, at \*2 (E.D.N.Y. Feb. 10 2023) (under *Doe*, employees cannot be held liable as "individual employers"); *Kent-Friedman v. N.Y.S. Ins. Fund*, No. 18 Civ. 4422 (VM), 2023 WL 6292693, at \*9 (S.D.N.Y. Sept. 27, 2023) (holding *Doe* to preclude liability as "employers" even for individuals who are officers or agents of the corporate employer); *Bueno v. Eurostars Hotel Co.*, No. 21 Civ. 535 (JGK), 2022 WL 95026, at \*7 (S.D.N.Y. Jan. 10, 2022) ("Under a recent decision by the New York Court of Appeals, a corporate employee—even its owner and CEO—no longer qualifies as an 'employer' under [NYSHRL or NYCHRL]"); *Harding v. Doriton Cap. Advisors LLC*, 635 F. Supp. 3d 286, 297 (S.D.N.Y. 2022) (under *Doe*, even "individual owners, officers, employees, or agents of a business entity" are not considered "employers" under NYSHRL and NYCHRL).

The ruling in *Doe* has different ramifications—depending on the statute—for the theories of liability for discrimination that Nezaj may pursue against Miller here.

***NYSHRL***: The NYSHRL provides for liability for discrimination on the part of employers only. Miller, as a non-employer, therefore cannot be held liable directly. However, the NYSHRL does permit an individual (including an employee) to be held liable for aiding and

---

[2] The Court of Appeals reached this result by, first, clarifying that the NYSHRL's test for *when an employer is liable*—which turns on whether the employer "became party to" an employee's discriminatory act so as to incur liability—is separate from the question of *who qualifies as an employer in the first place*. 143 N.Y.S.3d at 289–90. The Court of Appeals answered the latter question based on the texts of the NYSHRL and NYCHRL. Construing the term "employer" as used in these two statutes, the Court of Appeals noted that components of each impose liability on "employees" or "agents," supporting the implication that the statutes, when referring to an "employer," must be referring to something different. *Id.* at 291. Accordingly, the Court of Appeals held, "where a plaintiff's employer is a business entity, the shareholders, agents, limited partners, and employees of that entity are not employers within the meaning of the City [and State] HRL." *Id.* at 292. The consequence in *Doe* was that the individual defendants, who were shareholders of the corporate employer, could not be held liable on the theory that they were employers of the plaintiff. *See id.* at 293–294.

abetting a liable employer. *See, e.g., Baptiste v. City Univ. of N.Y.*, No. 22 Civ. 2785 (JMF), 2023 WL 4266914 (S.D.N.Y. June 29, 2023) ("[Individual defendants] can be held liable under the state statute only on an aider-and-abettor theory."); *Bueno*, 2022 WL 95026, at *7 ("[U]nder the NYSHRL, individual employees may be liable for aiding and abetting discriminatory conduct."). Nezaj thus may pursue liability for discrimination under the NYSHRL against Miller on that theory.

   *NYCHRL*: In contrast to the NYSHRL, the NYCHRL extends liability to employees, not just employers, a feature of the statute that *Doe* itself recognizes. *See Doe*, 143 N.Y.S.3d at 292 (employees "may incur liability [under the NYCHRL] [] for their own discriminatory conduct, for aiding and abetting such conduct by others, or for retaliation against protected conduct."). Therefore, an individual defendant, although not qualifying as an employer, may be held liable for discrimination either (1) directly, for his own participation in discrimination, or (2) for aiding and abetting other liable persons (including the employer). *See, e.g., Charles v. City of New York*, No. 21 Civ. 5567 (JPC), 2023 WL 2752123, at *7 (S.D.N.Y. Mar. 31, 2023) ("The New York Court of Appeals explained in *Bloomberg* that, for purposes of the NYCHRL, employees 'may incur liability only for their own discriminatory conduct, for aiding and abetting such conduct by others, or for retaliation against protected conduct'" (quoting *Doe*, 143 N.Y.S.3d at 292)); *Sutter v. Dibello*, No. 18 Civ. 817 (SJF) (AKT), 2021 WL 930459, at *30 (E.D.N.Y. Mar. 10, 2021) (language in NYCHRL referring to any "person" allows individual liability under direct and aiding and abetting theories of discrimination).

   *Retaliation claims*: The above discussion is addressed to discrimination claims. To the extent that the FAC asserts claims of unlawful retaliation against Miller, Nezaj may pursue these under each statute on theories both of (1) direct participation in the retaliation; and (2) aiding and

abetting retaliation by others.  That is because, although the NYSHRL does not provide for direct liability for discrimination other than by an "employer," it makes it unlawful for "any person" to retaliate.  *See* N.Y. Exec. Law § 296(7); *see also Everett v. N.Y.C. Dep't of Educ.*, No. 21 Civ. 7043 (JPC), 2023 WL 5629295, at *11, *14 (S.D.N.Y. Aug. 31, 2023) (NYSHRL proscribes discrimination by an "employer," retaliation by "any person").

### B.  Nezaj's Gender Discrimination Claims

#### 1.  Direct Liability

Miller's motion to dismiss the gender discrimination claims against him principally takes aim at the claim of direct liability on his part.  The Court applies the standards of the NYCHRL to that claim, because, as explained, the NYSHRL does not permit him, as a non-employer, to be found directly liable for discrimination.

To establish a gender-discrimination claim under the NYCHRL, "the plaintiff need only demonstrate . . . that she has been treated less well than other employees because of her gender." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (internal quotation marks omitted).  That is, "[t]o state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive[.]" *Gorokhovsky v. N.Y.C. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014).  "Unlike Title VII, the NYCHRL thus "does not require 'a connection between the discriminatory conduct and a materially adverse employment action.'" *Garrigan v. Ruby Tuesday, Inc.*, No. 14 Civ. 155, 2014 WL 2134613, at *3 (S.D.N.Y. May 22, 2014) (quoting *Mihalik*, 715 F.3d at 114).  Still, the liberal standards of the NYCHRL do not go so far as to establish a "general civility code[.]" *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 41 (1st Dep't 2009).

Although the FAC's allegations of gender discrimination center on Brooks, it alleges sufficient facts about Miller's conduct to plausibly suggest that Miller—independent of any acts

of aiding and abetting others—caused Nezaj to be treated "less well" on account of her gender. The Court reaches this conclusion having evaluated Miller's alleged actions in the "overall context" of the PS 450 workplace. *See Hernandez v. Kaisman*, 957 N.Y.S.2d 53, 59 (1st Dep't 2012); *see also Williams*, 872 N.Y.S.2d at 41 n.30 (even "a single comment that objectifies women . . . made in circumstances where that comment would, for example, signal views about the role of women in the workplace [may] be actionable.").

Here, the FAC alleges the following actions and omissions by Miller: (1) Miller declined to take any action after Nezaj, his subordinate, complained about a rude, misogynistic client, and laughed at Brooks' teasing her concerning the incident; (2) notwithstanding Nezaj's complaints, Miller deliberately did not provide Brooks with her December work schedule in advance, while providing other male managers with their December work schedules in advance; and (3) Miller refused to consider, and expressed annoyance at, Nezaj's request that PS450 purchase hygiene products for female staff.

These allegations plausibly plead a claim of gender discrimination under the NYCHRL, *i.e.*, differential treatment on the basis of gender.

In the first incident, Miller refused to defend, and scoffed at, Nezaj, when she complained about a misogynistic client, and laughed when fellow supervisor Brooks, in Nezaj's presence, joked about whether he should cause her to "do" "anything misogynistic" before leaving work that day. FAC ¶¶ 45–46. *See, e.g., Davis v. Phoenix Ancient Art, S.A.*, 975 N.Y.S.2d 365 (N.Y. Sup. Ct. 2013) (upholding gender discrimination claim under NYCHRL that defendant-owner of art gallery laughed at and condoned clients' comments about plaintiff's sex life); *Benzinger v. NYSARC, Inc. N.Y.C. Chapter*, 385 F. Supp. 3d 224, 232 (S.D.N.Y. 2019) (finding, in context of 42 U.S.C. § 1981 claim, that laughter at racist jokes or slurs evidenced discriminatory intent in

employment context and collecting cases). Miller's dismissive response contrasted with PS450's management's alleged solicitude towards a male employee, for whom management had "stepped in when [the] male employee had complained about a rude client." *Id.* ¶ 45. *See, e.g., Nguedi v. Federal Reserve Bank of New York*, No. 16 Civ. 0636 (GHW), 2017 WL 5991757, at *11 (S.D.N.Y. Dec. 1, 2017) (allegation that defendant "would help Caucasian employees to resolve issues like the [complained-of incident], but refused to help him and instead . . . laugh[ed] at him" supported finding that discrimination claim under NYCHRL was plausibly pled); *Torre v. Charter Communications, Inc.*, 493 F. Supp. 3d 276, 286 (S.D.N.Y. 2020) (sustaining claim of discrimination under Title VII, the NYSHRL, and the NYCHRL that "similarly situated . . . male colleague[s]" were "paid more than [plaintiff] was, despite having [similar] responsibilities and equal or lesser credentials"); *cf. Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 409–10 (S.D.N.Y. 2014) (dismissing claim of gender discrimination where complaint failed even to describe "any purported comparator" or offer any "basis from which to infer that defendants' treatment of [the plaintiff] was motivated *by gender*"). And the qualitative nature and stark quality of the different treatment of Nezaj and the male employee, as alleged, absolved Nezaj from having to plead—unlike, say, in a discrimination claim centered on promotion decisions— that she and the male employee had comparable qualifications or salary and seniority. *See, e.g., Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (plaintiff did not need to plead facts about comparators' "job function, experience, qualifications, [or] rate of pay[]" where employees were similarly situated as to disciplinary standards).

In the second incident, Miller withheld from Nezaj, PS450's only female manager, the restaurant's December schedule for her, dismissed her request for that schedule, and made last minute changes to it, while providing all male managers with their schedules in advances and not

making last-minute changes to them. *See* FAC ¶¶ 37, 53–57. This allegation classically describes "differential treatment based on a discriminatory motive," *Gorokhovsky*, 552 F. App'x at 102, sufficient to plead a claim under the NYCHRL. *See, e.g., Villar v. City of N.Y.*, 135 F. Supp. 3d 105, 142 (S.D.N.Y. 2015) (plaintiff established *prima facie* showing of race discrimination under § 1981 where he was denied overtime as only Hispanic lieutenant, and Caucasian lieutenants were allowed to work overtime); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 88 (2d Cir. 2015) (plausible discrimination claim under Title VII where Hispanic employee alleged he was assigned more work than non-Hispanic co-workers).

The third incident presents a different scenario. As alleged, Miller spurned Nezaj's request for feminine hygiene products, which she made to avoid having to leave the premises to purchase these, and he and Brooks mocked that request. FAC ¶¶ 59-60. Viewed in isolation, Miller's response, while rude and uncivil, would not plead differential treatment by gender, as the FAC does not plead contrasting behavior towards requests for accommodation by men. However, in the context of the balance of the FAC, which alleges gendered putdowns and frat-like attempts to humiliate Nezaj by male PS450 defendants including Miller, this episode fairly makes out an act of gender discrimination in violation of the NYCHRL. *See, e.g., Mitura v. Finco Services, Inc.*, No. 23 Civ. 2879 (VEC), 2024 WL 232323, at *4 (S.D.N.Y. Jan. 22, 2024) (supervisor's comment asking plaintiff "[d]o you even still menstruate" in response to proposed implementation of a menstruation leave policy showed effort to humiliate based on gender); *Sanderson v. Leg Apparel LLC*, No. 19 Civ. 8423 (GHW), 2020 WL 7342742, at *8 (S.D.N.Y. Dec. 14, 2020) (Complaint adequately alleged unfavorable treatment on basis of protected characteristic where comment by defendant that client was plaintiff's boyfriend after successful client call was "plausibly intended to diminish Plaintiff's success."); *Williams*, 872 N.Y.S.2d at

41 n.30 (conduct or comments which, in context, signal views about women in the workplace support gender-based discrimination claims under NYCHRL).

Viewing the above alleged episodes singly and in combination, the Court finds that the FAC plausibly alleges that Miller himself treated Nezaj less well on account of her gender.   The Court thus denies Miller's motion to dismiss the claim of direct liability under the NYCHRL.

### 2.    Aiding and Abetting Liability

Miller separately challenges the claims of aiding and abetting liability for gender discrimination.  Such a theory, as noted, is viable under both the NYSHRL and NYCHRL.  *See* Miller Br. at 18-21.  Miller Br. at 18–21; FAC ¶¶ 135–40.  Both "prohibit 'aid[ing], abet[ting], incit[ing], compel[ling] or coerc[ing] the doing' of any unlawful acts of discrimination under either title[.]"  *McHenry v. Fox News Network*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020) (quoting N.Y. Exec. Law § 296(6); N.Y.C. Admin Code ¶ 8-107(6)).  The same standard for aiding and abetting liability applies under the two statutes, as their texts are "virtually identical."  *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004).

To state a claim for aiding and abetting unlawful discrimination or retaliation, a plaintiff must plead that the defendant "actually participate[d]" in the unlawful conduct of the principal actor.  *Id.*; *see also Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 337 (S.D.N.Y. 2020) (internal citations and quotations omitted).  The aider and abettor must also "share the intent or purpose of the principal actor."  *Fried v. LVI Servs., Inc.*, 10 Civ. 9308 (JSR), 2011 WL 2119748, at *8 (S.D.N.Y. May 23, 2011).  It follows, that, as a predicate to claiming aiding and abetting discrimination, a plaintiff must have pled discrimination by a principal.  *See Xiang v. Eagle Enters., LLC*, No. 19 Civ. 1752 (PAE), 2020 WL 248941, at *5–6 (S.D.N.Y. Jan. 16, 2020).

To the extent Miller's challenge to the aiding and abetting claims against him is that such liability cannot be based on Miller's status at PS450 as a supervisor, *id.* at 18, he is correct. Aiding and abetting liability requires actual participation in the conduct giving rise to the claim. It cannot be based on status or job title alone. *See McHenry*, 510 F. Supp. 3d at 68; *Farmer*, 473 F. Supp. 3d at 337.

The FAC, however, pleads actual participation by Miller in acts of gender discrimination by others. At the outset, Miller does not dispute that the FAC adequately alleges principal liability for discrimination on the part of the other defendants, including Brooks and Wagman, and, on the basis of those defendants' actions, PS450. And based on Miller's conduct reviewed above, it is plausibly pled that Miller aided and abetted, at a minimum, Brooks (and through him, PS450) in their discriminatory conduct. *See McHenry*, 510 F. Supp. 3d at 73 (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995). The FAC pleads that Miller laughed at, supported, and encouraged Brooks' discriminatory commentary and conduct towards Nezaj; that Miller reinforced the others' discriminatory acts by denying Nezaj her December schedule; and that Miller, despite being aware of others' discrimination and Nezaj's complaint about it and despite being her supervisor, failed to take remedial action. Viewed together, these allegations fairly plead Miller's direct participation in discriminatory conduct and that he shared a common purpose or intent with, at a minimum, Brooks. *See, e.g., Hicks v. IBM*, 44 F. Supp. 2d 593, 600 (S.D.N.Y. 1999) (sustaining aiding and abetting claims against supervisors where plaintiff pled that, by failing to take sufficient action in response to discrimination, they had "encouraged, condoned, or approved" of the unlawful activity); *Romero v. Howard Johnson Plaza Hotel*, No 97 Civ. 3706 (WHP), 1999 WL 777915, at *9 (S.D.N.Y. Sept. 29, 1999) (where manager laughed at other employees' conduct and failed to intervene, finding at summary judgment that

reasonable jury could find he actually participated in discrimination by "adding fuel to the fire");

*Achee v. Incorporated Village of Valley Stream*, No. 20 Civ. 5294 (NG) (LGD), 2023 WL

7130717, at *13 (E.D.N.Y. Oct. 30, 2023) (denying summary judgment on aiding and abetting

theory where there was a triable issue of fact whether supervisor knew of discriminatory remarks

made against plaintiff yet failed to take action); *Al-Shimary v. State Univ. of N.Y. at Binghamton*,

No. 22 Civ. 1282 (TJM) (ML), 2023 WL 7128861, at *5–6 (N.D.N.Y. Oct. 30, 2023) (denying

motion to dismiss aiding and abetting claim where complaint pled that defendant knew of

discrimination and "did nothing to help Plaintiff in making a complaint about the matter").

The Court thus denies Miller's motion to dismiss the claims, under the NYSHRL and

NYCHRL, of aiding and abetting gender discrimination.

**C.    Nezaj's Sexual Orientation Discrimination Claims**

Miller next moves to challenge the claim of sexual orientation discrimination in violation

of the NYCHRL. This claim, in contrast to the gender discrimination claim, is not plausibly

pled, even under the NYCHRL's relaxed pleading standards.

There are no allegations in the FAC of conduct on Miller's part indicative of sexual

orientation discrimination. The few allegations that even nod in this direction are general ones to

the effect that he, at most, "allowed," "supported," "witnessed," or "condoned" such behavior,

and these lack specifics as to the conduct that Miller allegedly witnessed and condoned, let only

how he did so. FAC ¶¶ 27–28. Absent concrete details, these conclusory allegations fall short of

stating an NYCHRL claim for sexual orientation discrimination. *See, e.g.*, *Lettieri v. Anti-*

*Defamation League Foundation*, No. 22 Civ. 9889 (PAE), 2023 WL 5152447, at *6 (S.D.N.Y.

Aug. 10, 2023) (setting aside conclusory allegations of discrimination in assessing whether

complaint stated claim); *Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 117

(S.D.N.Y. 2020) ("purely conclusory allegations of discrimination, absent any concrete particulars," fail to state claim) (citation omitted)).

For the same reasons, the FAC's threadbare allegations would not permit Miller to be held liable for aiding and abetting others' discrimination on the basis of sexual orientation. *See, e.g., Fried v. LVI Servs., Inc.*, No. 10 Civ. 9308 (JSR), 2011 WL 2119748, at *7–8 (S.D.N.Y. May 23, 2011) (dismissing aiding and abetting claims for failure to allege facts plausibly supporting actual participation in unlawful discrimination); *McHenry*, 510 F. Supp. 3d at *77 (same). For the purposes of this motion, the Court assumes to be well-pled the FAC's claims of such discrimination by others (*e.g.*, Brooks and PS450). But the FAC is devoid of non-conclusory allegations that Miller actually participated in this form of discrimination, let alone shared a discriminatory intent or purpose.

The Court accordingly dismisses the FAC's claims against Miller of sexual orientation discrimination, whether these assert direct liability (under the NYCHRL) or aiding and abetting liability (under either statute).

### D.   Nezaj's Retaliation Claims

Miller next argues that the FAC does not state a claim against him for retaliation under either the NYSHRL or NYCHRL. Miller Br. at 22–25.

### 1.   NYSHRL

The NYSHRL makes it unlawful for an employer to retaliate or discriminate against an employee because she "has opposed any practices forbidden under this article or because . . . she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law. § 296(7). Retaliation claims under the NYSHRL are analyzed using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this standard, to make out a *prima facie* case of retaliation, a plaintiff must establish: "(1) that she participated in

21

an activity protected by [NYSHRL], (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). The plaintiff's burden of proof at the *prima facie* stage is "*de minimis.*" *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

Further, at the motion to dismiss stage, "the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of [an NYSHRL] litigation." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 316 (2d Cir. 2015)). For a retaliation claim to survive a motion to dismiss, "the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against [her], (2) because [s]he has opposed any unlawful employment practice." *Id.* (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015)).

The FAC clears these hurdles, plausibly asserting direct liability for retaliation on Miller's part.[3] It alleges that Nezaj complained to Wagman about Brooks' harassing conduct, specifically referencing the "pee on a stick" comment as well as the "phone" incident, and

---

[3] In August 2019, the NYSHRL was amended to direct courts to construe the NYSHRL, like the NYCHRL, "liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws including those laws with provisions worded comparably to the provisions of [the NYSHRL] have been so construed." N.Y. Exec. Law § 300. This language thus liberalized the NYSHRL standards, bringing them closer to the standards under the more lenient NYCHRL. However, it is as of yet unclear whether these two standards are co-extensive, or whether the NYSHRL requires something in between federal and local law for discrimination claims. *See Yost v. Everyrealm Inc.*, No. 22 Civ. 6549 (PAE), 2023 WL 2224450, at *11 (S.D.N.Y. Feb. 24, 2023). Here, the Court finds that Nezaj has pled enough to state a claim under the higher standards of the pre-amendment NYSHRL, and thus at this stage need not parse the exact contours of the new, liberalized NYSHRL standards.

relating that this conduct made her feel humiliated. FAC ¶¶ 65–71. This complaint is a paradigmatic instance of protected activity. *See, e.g., Curcio v. Roosevelt Union Free School Dist.*, No. 10 Civ. 5612 (SJF) (AKT), 2012 WL 364935, at *12 (E.D.N.Y. Aug. 22, 2012) (plaintiff who complained to supervisor about harassment engaged in protected activity); *Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 427 (E.D.N.Y. 2009) (same). The FAC further alleges that, despite Nezaj's request that the complaint be kept confidential, Wagman disclosed it to Brooks and Miller, thus putting Miller on notice of this protected activity. FAC ¶ 71.

The FAC alleges that, thereafter, Miller retaliated against her—by all but ignoring her, shutting her out of her management responsibilities over her protests, and then participating in terminating her for failure to complete the very duties Miller inhibited her from discharging. *Id.* ¶¶ 73–74, 100–01. These responses are adequately pled as adverse actions, meeting that prong of the *prima facie* case. Taking away an employee's responsibilities can constitute an adverse retaliatory action, *see Frederick v. Passfeed*, No. 21 Civ. 2066 (RA), 2022 WL 992798, at *11 (S.D.N.Y. March 31, 2022) (complaint pled retaliatory adverse action where supervisor allegedly ignored her and reassigned project within her job description). And termination is the archetypal form of adverse action. *See, e.g., Feingold*, 366 F.3d at 152 ("Examples of materially adverse employment actions include termination of employment." (cleaned up)); *Sanders v. N.Y.C. Human Res. Admin*, 361 F.3d 749, 755 (2d Cir. 2004) (listing termination as adverse action).

Finally, as pled, there was close temporal proximity between Nezaj's complaint to PS450 management and the allegedly retaliatory conduct. The FAC alleges that Miller began reducing her work responsibilities almost immediately after her complaint about Brooks, and that her termination came only about two months later. This sequence and timing, on the pleadings,

adequately raise an inference of a causal connection between the protected activity and the alleged retaliatory conduct. *See Duplan*, 888 F.3d at 626; *Chan v. NYU Downtown Hospital*, 03 Civ. 3003 (CBM) (KNF), 2004 WL 213024, at *3 (S.D.N.Y. Feb 3, 2004) (complaint pled facts tending to show causal link where soon after alleged protected activity plaintiff "began to experience a lack of supervisory support"); *see also, e.g., Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554–55 (2d Cir. 2001) (five-month gap between protected activity and retaliatory act sufficiently close to support a causal inference); *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 393 (S.D.N.Y. 2019) (approximately two-month gap between protected activity and retaliatory act supported inference of causal connection); *Ulrich v. Soft Drink, Brewery Workers & Delivery Emps.*, 425 F. Supp. 3d 234, 241 (S.D.N.Y. 2019) (slightly over two-month gap between protected activity and adverse employment action sufficient to give rise to causal connection between the two).

For much the same reasons, the FAC plausibly pleads aiding and abetting liability for retaliation on Miller's part. In the Second Circuit, a defendant can be held liable under an aiding and abetting theory even where his own conduct is the predicate. *See McHenry*, 501 F. Supp. 3d at 74–75. In any event, Miller's allegedly retaliatory conduct towards Nezaj, whether excluding her from aspects of her work responsibilities, or participating in her termination, are easily read as supporting a broader retaliatory campaign by others, including Brooks, Wagman, and, through them, PS450.

The Court therefore denies Miller's motion to dismiss the retaliation claims under the NYSHRL, whether based on direct or aiding and abetting liability.

### 2.    NYCHRL

The NYCHRL's standards for retaliation liability are more permissive than the NYSHRL standards applied above. *See Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 268–69 (S.D.N.Y.

2020); *Xiang*, 2020 WL 248941, at *8. Because the FAC's retaliation claims under the NYSHRL, of direct and aiding and abetting liability, are well pled, these claims necessarily also satisfy the NYCHRL. *See, e.g., Farmer*, 473 F. Supp. 3d at 334 (because retaliation claims met NYSHRL standard, it also met NYCHRL standard).

## CONCLUSION

For the foregoing reasons, the Court grants Miller's motion to dismiss, to the extent it is directed to the claims against him of sexual orientation discrimination, and otherwise denies the motion to dismiss. The Clerk of Court is respectfully directed to terminate the motion pending at Docket 53.

In a separate order issued today, the Court will set a new date for an initial pretrial conference.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 27, 2024
New York, New York